## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **ELECTRONIC PRIVACY** | ) | |
| **INFORMATION CENTER**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2013 -cv- 00442 (TSC) |
| | ) | |
| | ) | |
| **FEDERAL BUREAU** | ) | |
| **OF INVESTIGATION**, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Electronic Privacy Information Center ("EPIC") moves this Court for an award of fees and costs arising out of the instant Freedom of Information Act Complaint. For the reasons that follow, the Court grants in part and denies in part EPIC's Motion (ECF No. 15).

### I.    BACKGROUND

EPIC filed its Complaint for Injunctive Relief (ECF No. 1) on April 8, 2013, seeking to compel the FBI's compliance with two Freedom of Information Act ("FOIA") requests for the release of certain records related to the FBI's Next Generation Identification ("NGI") program.

On September 20, 2012, more than six months prior to filing this suit, EPIC transmitted its first FOIA request ("First Request") to the FBI.  (Ex. A (ECF No. 16-2) to

Hardy Decl., itself Ex. 1 to Def.'s Mot.).  On September 21, 2012, one day after it submitted its First Request, EPIC submitted another FOIA request ("Second Request") to the FBI regarding the NGI system.  (Hardy Decl. Ex. G).

The FBI acknowledged receipt of EPIC's First and Second Requests by separate letters dated September 26, 2012 (Hardy Decl. ¶¶ 8, 17; *Id*. Exs. B, H).

Two days later, the FBI informed EPIC that it had "located approximately 7,380 pages which are potentially responsive to the FOIA [request]" and invited EPIC to narrow the scope of the Second Request.  (*Id*. ¶ 19).  Following a discussion with the FBI's Records/Information Dissemination Section, on October 19, EPIC provided the FBI with a narrowed Revised Second Request.  (*Id*. ¶ 21; *Id*. Ex K).

After receiving no substantive response from the FBI regarding its FOIA requests, EPIC then filed this suit.  EPIC asserts that following the submission of its Revised Second Request in October 2012 through the date on which it filed its Complaint almost 6 months later, "FBI had not contacted EPIC again regarding the status of any of the requests, nor had the FBI disclosed a single agency record in response to any of its requests." (Mot. 5).  The FBI represents that during that time, it conducted initial searches and gathered potentially responsive records but was unable to complete its processing "due to its backlog of prior pending requests and limited resources."  (Hardy Decl. ¶¶ 9, 13, 23, 34–37).

On May 30, 2013, the Court issued an Order (ECF No. 8) requiring the parties to file, on or before June 26, 2013, a joint proposed briefing schedule for the filing of dispositive motions.

By letter dated June 6, 2013, the FBI released 592 pages of material to EPIC in response to its First Request.  (Hardy Decl. ¶ 15).  Because the FBI determined that "the contract had been public at one point, no redactions were necessary."  (*Id*.).

In response to the Court's May 30, 2013 Order, on June 26, 2013 the parties filed a Joint Proposed Briefing Schedule.  (ECF No. 9).  In addition to proposing a dispositive motion briefing schedule, the parties also stipulated that "Defendant will produce to Plaintiff all non-exempt responsive materials on or before August 30, 2013, with an interim production on or before July 31, 2013."  (*Id*.).  The Court then issued an Order on June 28, 2013 implementing the parties' proposed dispositive motion briefing schedule and the parties' proposal regarding production, ordering "that the defendant *shall* produce to the plaintiff all non-exempt responsive materials on or before August 30, 2013, with an interim production on or before July 31, 2013."  (ECF No. 10 (emphasis added)).

By letter dated July 31, 2013, the FBI made its first interim release to EPIC in response to the Second Request.  (Hardy Decl. ¶ 27; *Id*. Ex. N).  By letter dated August 30, 2013, the FBI made its second release.  (*Id*. ¶ 28; *Id*. Ex. O).

The parties filed a Joint Status Report on December 4, 2013 (ECF No. 14), in which they informed the Court that no underlying legal issues remained and requested a briefing schedule to resolve the issue of attorneys' fees.

EPIC requests an award of $15,851.50, representing attorney fees of $15,501.50 and costs of $350, for its prosecution of the instant civil suit and an additional $6,272.50 in fees for preparation of its Reply, for a total award of $22,124.00.  The FBI responds that

3

EPIC's request for fees should be denied entirely or substantially reduced.  The FBI

concedes that EPIC is entitled to costs of $350.00 for filing the Complaint.


## II.    ANALYSIS

### a.  Eligibility for Attorneys' Fees and Costs Under FOIA

The Freedom of Information Act provides that courts "may assess against the

United States reasonable attorney fees and other litigation costs reasonably incurred in any

case . . . in which the complainant has substantially prevailed."  5 U.S.C. §

552(a)(4)(E)(i).  This language divides the attorneys' fee inquiry into two prongs, which

this Circuit has long described as fee "eligibility" and fee "entitlement."  *Brayton v. Office

of the U.S. Trade Representative*, 641 F.3d 521, 524 (D.C. Cir. 2011) (citing *Judicial

Watch, Inc. v. U.S. Dep't of Commerce*, 470 F.3d 363, 368–69 (D.C. Cir. 2006)).  The

eligibility prong asks whether a plaintiff has "substantially prevailed" and thus "may"

receive fees.  *Id.* (citing *Judicial Watch v. Dep't of Commerce*, 470 F.3d at 368).  "If so,

the court proceeds to the entitlement prong and considers a variety of factors to determine

whether the plaintiff *should* receive fees."  *Id.* (emphasis added) (citing *Judicial Watch v.

Dept' of Commerce*, 470 F.3d at 369).

A party has "substantially prevailed" by obtaining relief through either "a judicial

order, or an enforceable written agreement or consent decree" or "a voluntary or unilateral

change in position by the agency, if the complainant's claim is not insubstantial."  5

U.S.C. § 552(a)(4)(E)(ii)(I) and (II).  EPIC argues that it substantially prevailed under the

4

former provision by obtaining the FBI's production of 2,462 pages[1] of responsive documents pursuant to the Court's June 28, 2013 Order.

This Circuit offers ample relevant authority.  In *Judicial Watch, Inc. v. FBI*, 522 F.3d 364 (D.C. Cir. 2008), the Court held that the plaintiff prevailed because "the parties had stipulated that the defendant agency would produce the requested records by a date certain and the trial court approved the parties' joint stipulation."  *Id*. at 368 (quotation omitted).  The D.C. Circuit found *Judicial Watch v. FBI* factually indistinguishable from *Davy v. CIA*, 456 F.3d 162 (D.C. Cir. 2006) ("*Davy I*"), which similarly held that the plaintiff prevailed on the basis of a joint stipulation, approved by the district court, that the defendant would provide "all responsive documents, if any" by dates certain.  *Davy I*, 456 F.3d at 164.  In *Judicial Watch v. FBI*, as in *Davy I*, the Court emphasized that "[p]rior to the parties' joint stipulation and order, . . . '[the defendant] was not under any judicial direction to produce documents by specific dates; the . . . order changed that by requiring the [defendant] to produce all responsive documents by the specified dates.'" *Judicial Watch v. FBI*, 522 F.3d at 367–68 (quoting *Davy I*, 456 F.3d at 166); *Id*. at 370 ("As we have held time and again, orders like these [directing the government to release information sought pursuant to FOIA], even when voluntarily agreed to by the government, are sufficient to make plaintiffs eligible for attorneys' fees under FOIA."); *see also Campaign for Responsible Transportation v. FDA*, 511 F.3d 187, 197 (D.C. Cir. 2007) (court order requiring recalcitrant agency to release documents pursuant to FOIA sufficient to render plaintiff a prevailing party; agreement of defendant to terms mandated by court order is

---

[1] The FBI produced 517 pages on July 31, 2013, 1,406 pages on August 30, 2013, and 539 pages on November 1, 2013 (the latter in response to the non-consecutive pagination issue, *see* p. 20 and n.13, *infra*).

irrelevant); *Edmonds v. FBI*, 417 F.3d 1319, 1324; 1326–27 (D.C. Cir. 2005) (plaintiff prevails by obtaining an order providing judicial direction to produce all nonexempt documents by a date certain; plaintiff may be considered prevailing party by succeeding on any significant issue in litigation which achieves some of the benefit the plaintiff sought in bringing suit).

In determining fee eligibility, one particularly relevant factor is whether there has been an award of some relief on the merits of a claim and a "judicially sanctioned change in the legal relationship of the parties." *Davy I*, 456 F.3d at 165–66; *see also Judicial Watch v. FBI*, 522 F.3d at 370 (holding Judicial Watch was awarded some relief by a court when it obtained, pursuant to court orders, the two videotapes it sought).

This principle was recently applied in *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 774 F. Supp. 2d 225 (D.D.C. 2011). There, the parties filed a joint stipulation, approved by the court, declaring that the DOJ would complete production of all responsive documents by a date certain. Judicial Watch asserted that the Court's adoption of the stipulation constituted a judicial award of relief on the merits; the DOJ countered that the minute order was merely procedural. The Court found the DOJ's argument unavailing under *Judicial Watch v. FBI*, *Davy I*, *Campaign for Responsible Transportation*, and *Edmonds* and held that the minute order "fits squarely within the holdings of these cases." *Id*. at 229. The Court found the minute order "functionally indistinguishable from that in *Davy[ I]*, where the stipulation, approved by the district court, stated that the defendant would provide 'all responsive documents, if any,' by certain dates." *Id*. (quoting *Davy I*, 456 F.3d at 164).

In light of the well-established precedent in this Circuit, the Court finds that EPIC is eligible for attorneys' fees and costs because it substantially prevailed by obtaining production of responsive documents pursuant to the Court's June 28, 2013 Order, which approved the parties' stipulated production date.  Compliance with this Order constituted both some relief on the merits of EPIC's claim and a judicially sanctioned change in the parties' legal relationship.  That the FBI consented to the terms mandated by the Court's Order is immaterial.

The FBI's arguments to the contrary are quickly dispatched.  First, the FBI argues that the nature of the order in *Davy I* is distinguishable from the Court's June 28, 2013 Order here because "[t]he order at issue in *Davy I* was not a routine scheduling order." (Opp'n 8).  While the order at issue in *Davy I* was not a "routine scheduling order," neither is the Court's June 28, 2013 Order in this case; in addition to addressing scheduling matters, it ordered the FBI to produce all non-exempt responsive documents by a date certain.  As in *Davy I*, this was "functionally a settlement enforced through a consent decree" that altered the parties' legal relationship.  *Davy I*, 456 F.3d at 166.[2] Next, the FBI argues that the purpose of the Court's May 30, 2013 request was simply to set a briefing schedule.  This assertion is somewhat undercut by the fact that the parties chose to include the stipulated production schedule in their response.  Regardless, the purpose of the Court's request is irrelevant because it is the Court's Order approving the parties' production stipulation that is determinative under the controlling law.  Lastly, the FBI argues that unlike the agency in *Davy I*, it had already produced some records

---

[2] Indeed, the production provision of the Court's Order here is strikingly similar to those discussed in *Judicial Watch v. FBI, Judicial Watch v. Dep't of Justice*, *Davy I*, *Campaign for Responsible Transportation*, and *Edmonds*.

responsive to EPIC's First Request prior to issuance of the Court's Order and therefore the Order should not be treated as having provided EPIC with the relief it sought.  However, the law merely requires that the plaintiff "substantially prevails," 5 U.S.C. § 552(a)(4)(E)(ii), and achieves *some* of the benefit the plaintiff sought in bringing suit. *See, e.g. Edmonds*, 417 F.3d at 1326–27; *Davy I*, 456 F.3d at 165–66; *Judicial Watch v. FBI*, 522 F.3d at 370.[3]  Here, EPIC has done both.  For all of the foregoing reasons, the Court finds that EPIC is eligible pursuant to FOIA to recover attorneys' fees and costs for this suit.

### b.  Entitlement to Attorneys' Fees and Costs Under FOIA

Having resolved EPIC's eligibility, the Court next addresses whether EPIC is entitled to attorneys' fees and costs under FOIA.  To determine whether a "prevailing" FOIA plaintiff is entitled to fees award, the district court must assess four factors:  "(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding."  *Davy I*, 456 F.3d at 166 (quoting *Tax Analysts v. U.S. Dep't of Justice*, 965 F.2d 1092, 1093 (D.C. Cir. 1992)); *see also Morley v. CIA*, 719 F.3d 689, 690 (D.C. Cir. 2013) (reaffirming the four-factor *Davy I* test).  In applying these factors, "[n]o one factor is dispositive."  *Davy v. CIA*, 550 F.3d 1155, 1159 (D.C. Cir. 2008) ("*Davy II*").  "The sifting of those criteria over the facts of a case is a matter of district court discretion." *Tax Analysts*, 965 F.2d at 1094.  Having considered all of the relevant factors, the Court concludes that EPIC is entitled to recover fees and costs.

---

[3] While the FBI did produce some documents prior to the Court's June 28, 2013 Order, it did not produce *any* responsive documents until *after* EPIC filed its Complaint in this matter.

### i. Public Benefit Factor

The public benefit factor weighs in favor of granting attorneys' fees "where the complainant's victory is likely to add to the fund of public information that citizens may use in making vital political choices." *Cotton v. Heyman*, 63 F.3d 1115, 1120 (D.C. Cir. 1995) (quoting *Fenster v. Brown*, 617 F.2d 740, 744 (D.C. Cir. 1979)) (internal quotation marks omitted). This first factor requires consideration of both the effect of the litigation for which fees are requested and the public value of the information sought. *See Chesapeake Bay Found. v. USDA*, 108 F.3d 375, 377 (D.C. Cir. 1997); *Cotton*, 63 F.3d at 1120; *Tax Analysts*, 965 F.2d at 1093–94.

EPIC contends that the material it sought regarding the NGI system is precisely the sort of valuable public information contemplated in *Cotton*. EPIC, which describes itself as "a public interest and research organization incorporated as a not-for-profit corporation . . . [that] conducts oversight of Government activities and policies and analyzes their impact on civil liberties and privacy interests,"[4] has already published the FBI records it received on its website and to the approximately 8,000 recipients of its bi-weekly newsletter. (Mot. 9). EPIC quotes from a *New York Times* opinion piece, written by one of EPIC's counsel, regarding the surveillance implications of facial scanning technology and referencing the materials sought in this matter. (Mot. 9–10).[5] In addition, EPIC cites

---

[4] (Compl. ¶ 4). EPIC also claims that it focuses "public attention on emerging privacy and civil liberties issues." (Reply 5).

[5] Ginger McCall, *The Face Scan Arrives*, NEW YORK TIMES, Aug. 29, 2013, http://www.nytimes.com/2013/08/30/opinion/the-face-scan-arrives.html. In its Opposition, the FBI questions whether "EPIC could rely on its own opinion article to establish media interest . . . ." (Opp'n 12). Although this piece was written by one of EPIC's counsel, it appeared in The Opinion Pages in section A of the print edition of the New York Times. McCall, *supra*. Publication of an opinion piece about the facial recognition technology implicated by the NGI system in a newspaper of such significant circulation indicates a genuine level of national public interest in the system.

numerous articles regarding facial recognition technology and the NGI system.  (Mot. 9–11; Reply 5–6).[6]

The dissemination of the material sought by EPIC, and the NGI system itself, are fairly within the public interest.  The FBI's own website proclaims that its current fingerprint identification system is the largest in the world.[7]  The implications of expanding this system to include multimodal biometric data and interoperability with existing and future technology (Mot. 1–2) are of significant public interest, whether in the form of EPIC's concerns regarding liberty interests and privacy rights, the FBI's concerns with more effectively combatting terrorism and crime, or otherwise.  The NGI contracts and technical specifications that EPIC received are likely to expand public knowledge of the NGI system and inform debate regarding how the system and its data are used, both now and during implementation.  There can be little dispute that the general public has a genuine, tangible interest in a system designed to store and manipulate significant quantities of its own biometric data, particularly given the great numbers of people from whom such data will be gathered.

The FBI contends that few of the articles cited by EPIC mention the specific records obtained in this case and that the records obtained have not already benefitted the public.  This argument focuses the public benefit factor too narrowly.  The relevant inquiry is whether EPIC's success "is *likely* to add to the fund of public information that

---

[6] In its Motion, EPIC cites to articles discussing facial recognition technology and privacy concerns from The Economist, CIO.com, Network World, CNN, Salon, the Center for Investigative Reporting, and the Providence Journal. (Mot. 10–11).  EPIC cites articles from additional sources in its Reply.  (Reply 5–6).

[7] (Mot. 2 n.2) (citing Integrated Automated Fingerprint Identification System, FBI.GOV, http://www.fbi.gov/about-us/cjis/fingerprints_biometrics/iafis/iafis (last visited Nov. 3, 2014)).

citizens may use in making vital political choices." *Cotton*, 63 F.3d at 1120; *see also Morley*, 719 F.3d at 690 (quoting *Davy II*, 550 F.3d at 1162 n.3 for the proposition that "[i]t would also be inconsistent with congressional intent to disqualify plaintiffs who obtain information that, while arguably not of immediate public interest, nevertheless enables further research ultimately of great value and interest."). The Court finds that the information EPIC sought meets these criteria.

Second, the FBI argues that because the contract EPIC sought by its First Request had already been made public, its release to EPIC did not benefit the public. Pertinent to the Court's public benefit factor analysis is "the extent to which the information released is already in the public domain." *Nw. Coal. for Alternatives to Pesticides v. Browner*, 965 F. Supp. 59, 64 (D.D.C. 1997). However, the FBI has not explained how and to what extent the contract was already publicly disseminated; it merely states that "the contract had been made public at one point" and that "material was already in the public domain" (Hardy Decl. ¶ 15; *see also* Opp'n 11). Without further information, the Court is unable to weigh the extent of the contract's previous public dissemination. *Cf. Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 36 (D.C. Cir. 1998) ( "[s]uch an explanation is necessary because the mere fact that the material is in the public domain does not justify denying a fee waiver; only material that has met a threshold level of public dissemination will not further public understanding within the meaning of the fee waiver provisions."). Moreover, EPIC sought and obtained a significant amount of information in addition to the contract, none of which the FBI contends was already public. For all of the above reasons, the Court finds that the public interest factor weighs in EPIC's favor.

### ii. Commercial Benefit and Nature of Interest Factors

The "commercial benefit" and "plaintiff's interest" factors are closely related and often evaluated together. *Tax Analysts*, 965 F.2d at 1095 ("FOIA was fundamentally designed to inform the public and not to benefit private litigants" and "when a litigant seeks disclosure for a commercial benefit or out of other personal motives, an award of attorney's fees is generally inappropriate.") (internal quotations omitted); *see also U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495–96 (1994) (describing FOIA's core purpose of contributing to the public understanding of government operations or activities).  EPIC, which describes itself as a not-for-profit public interest and research organization, contends that its interests in the records obtained in this case are entirely public-oriented and that it has derived no commercial benefit from its FOIA request or from this suit.  The Court finds this argument, to which the FBI did not respond, persuasive.  Accordingly, the commercial benefit and nature of interest factors weigh in favor of EPIC's fees request.

### iii. Reasonableness of Agency Withholding Factor

The fourth factor directs the Court to consider whether the agency's withholding "had a reasonable basis in law" and whether the agency was "recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior."  *Tax Analysts*, 965 F.2d at 1096 (internal quotation omitted).  "If the Government's position is correct as a matter of law, that will be dispositive.  If the Government's position is founded on a colorable basis in law, that will be weighed along with other relevant considerations in the entitlement calculus."  *Davy II*, 550 F.3d at 1162 (quoting *Chesapeake Bay Found., Inc. v. U.S. Dep't*

*of Agric.*, 11 F.3d 211, 216 (D.C. Cir. 1993)); *see also Cotton*, 63 F.3d at 1121 (government need only have a colorable basis in law for court to consider the reasonable basis in law factor in determining a FOIA plaintiff's entitlement to attorneys' fees). "The question is not whether [the plaintiff] has affirmatively shown that the agency was unreasonable, but rather whether the agency has shown that it had any colorable or reasonable basis for not disclosing the material until after [the plaintiff] filed suit." *Davy II*, 550 F.3d at 1163.

EPIC contends that the FBI had no reasonable legal basis for failing to disclose the requested records and that the FBI's delay in responding to EPIC's FOIA requests violated the statutory deadline,[8] thus forcing EPIC to file this action.  In response, the FBI concedes that it "was not able to process the request within the 20 working days prescribed by FOIA" (Opp'n 16) but claims that it did not simply ignore EPIC's requests, and offers various explanations for its delays.

The FBI admits it did not timely process EPIC's FOIA requests but claims that it did not simply ignore them.  The FBI explains that it began its internal process in response to EPIC's First and Second Requests "within days" of receiving them, explains in some detail its responsive internal efforts, and states that the NGI program office did not begin the process of delivering the responsive documents to the FBI's Record/Information Dissemination Section until "early January" of 2013, over three months after EPIC transmitted its requests.  (Hardy Decl. ¶¶ 9; 13; 15; 23; 26).  The FBI claims that it was

---

[8] FOIA requires that each agency upon whom a request is made shall "determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefore, and of the right of such person to appeal to the head of the agency any adverse determination . . . ." 5 U.S.C. § 552(a)(6)(A).

unable to timely review and process the documents due to a backlog of prior FOIA requests, court-imposed deadlines in other FOIA cases, and its limited resources, including $700 million in budget cuts during the relevant time period due to a sequester and a continuing resolution.  (Opp'n 16–17).

In support of its argument that its delay was not unreasonable, the FBI cites *Simon v. United States*, 587 F. Supp. 1029, 1032 (D.D.C. 1994) and *Read v. Fed. Aviation Admin.*, 252 F. Supp. 2d 1108, 1112 (W.D. Wash. 2003) for the proposition that, while an agency's failure to meet deadlines is not to be condoned, it does not by itself weigh in favor of a fees award.  The FBI's reliance on these cases is misplaced.  As EPIC correctly points out, the Court in *Simon* found that when none of the first three factors of the entitlement analysis favored the plaintiff, an agency's failure to meet deadlines, absent any evidence of bad faith, did not "in and of itself" warrant an award of fees.  *Simon*, 587. F. Supp. at 1032.  In those circumstances, the Court declined to impose a fee award simply to "sanction sluggish agency response."  *Id*.  Here, the Court finds that the first three entitlement factors favor EPIC; the Court therefore does not consider whether the FBI's delay "in and of itself" warrants a fee award.

The FBI also relies on *United Am. Fin., Inc. v. Potter*, 770 F. Supp. 2d 252 (D.D.C. 2011), which is similarly inapplicable to the facts in this case.  In that case, none of the first three entitlement factors favored the plaintiff.  The Court found that the fourth factor weighed in the defendant agency's favor when, even though its legal theory ultimately failed, it "articulated a reasonable legal position and did not exhibit the kind of stubborn opposition to the valid claims that FOIA seeks to discourage."  *Id*. at 258.  Here, not only

14

do the  first three factors favor EPIC, but, unlike the agency in *Potter*, the FBI has not articulated a colorable or reasonable position grounded in law for its delay in responding to EPIC's FOIA requests.

The FBI's explanation for its delay in producing the requested documents is not unreasonable; the Court is well aware that compliance with FOIA requests can require significant agency time and resources.  However, after EPIC narrowed the scope of its Second Request—at the behest of the FBI—the FBI had no further contact with EPIC for six months, until after EPIC filed this lawsuit.  The FBI has not advanced any colorable legal reason why, after indicating that it possessed responsive documents and asking for a revised request, it simply ceased all communication with EPIC in October 2012, until EPIC sought recourse in this Court in April 2013.[9]  However, while the FBI has not met its burden of showing a reasonable or colorable basis in law for not timely processing EPIC's requests, there is also no evidence that the FBI acted recalcitrantly or obdurately.  On balance, therefore, the Court finds the fourth factor neutral in its analysis.

In sum, given that the first three factors favor an award of fees and the fourth is neutral, the Court finds that EPIC is entitled to recover attorneys' fees pursuant to FOIA.

## III.    THE REASONABLENESS OF EPIC'S REQUESTED ATTORNEYS' FEES AND COSTS

FOIA provides that a plaintiff who substantially prevails may be awarded "reasonable attorney fees and other litigation costs."  5 U.S.C. § 552(a)(4)(E)(i).  EPIC requests an award of $15,851.50, comprised of $15,501.50 in attorneys' fees and $350 in

---

[9] As noted *supra*, the FBI did not make its first document production until June 6, 2013.

costs, plus $6,272.50 in fees for preparation of its Reply.  Having found EPIC eligible for

and entitled to fees, the Court must now evaluate the reasonableness of EPIC's request.

    The usual method of calculating reasonable fees is to "multiply the hours

reasonably expended in the litigation by a reasonable hourly fee, producing the 'lodestar'

amount."  *Bd. of Trs. of Hotel & Rest. Emps. Local 25 v. JPR, Inc.*, 136 F.3d 794, 801

(D.C. Cir. 1998).  A reasonable hourly fee, in turn, is determined "according to the

prevailing market rates in the relevant community, regardless of whether plaintiff is

represented by private or non-profit counsel."  *Blum v. Stenson*, 465 U.S. 886, 895 (1984).

The second element of the lodestar calculation—reasonable hourly fees—requires

consideration "of at least three elements:  the attorneys' billing practices, the attorneys'

skill, experience, and reputation; and the prevailing market rates in the relevant

community."  *Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995).

Public interest or government attorneys who do not have customary billing rates may rely

upon the "*Laffey* Matrix,"[10] a schedule of fees based on years of experience developed in

*Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), *rev'd on other*

*grounds*, 746 F.2d 4 (D.C. Cir. 1984); *see Covington*, 57 F.3d at 1105–11 (noting value of

*Laffey* Matrix and affirming fee award calculated using it).

    Once the Court determines the proper lodestar amount, it has discretion to adjust

that amount on the basis of various other factors.  *See Weisburg v. U.S. Dep't of Justice*,

---

[10] The *Laffey* Matrix that EPIC attached as Exhibit 8 to its Motion is an older version for 2003–2012.  The Court relies upon the updated 2003–2014 Matrix available on the Department of Justice website at http://www.justice.gov/usao/dc/divisions/Laffey_Matrix%202014.pdf (last visited Nov. 3, 2014).

745 F.2d 1476, 1499–1500 (D.C. Cir. 1984);[11] *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1328–29 (D.C. Cir. 1982).  "The burden of justifying any deviation from the 'lodestar' rests on the party proposing the deviation."  *Copeland v. Marshall*, 641 F.2d 880, 892 (D.C. Cir. 1980) (*en banc*).  "When the Government seeks to rebut a rate or calculation or hours billed, it must provide—just as plaintiff must provide specific evidence in his application for attorney's fees—'equally specific countervailing evidence.'"  *Piper v. U.S. Dep't of Justice*, 339 F. Supp. 2d 13, 24 (D.D.C. 2004) (quoting *Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1326).

EPIC submitted detailed billing records showing dates, times, and the nature of the activities performed, records which its counsel attests were contemporaneously recorded and accurately reflect the work done by each attorney.  (Mot. 14).[12]  The FBI does not challenge EPIC's use of the *Laffey* Matrix or the lodestar method, nor does it challenge the sufficiency of the information within EPIC's billing records.  Rather, it challenges EPIC's ability to recover for specific work performed, the number of hours billed, the hourly rates EPIC seeks for its three most junior attorneys, and EPICs request for fees-on-fees.  The Court addresses each challenge in turn.

### a.  Time Spent Drafting, Reviewing, Discussing, and Filing the Complaint

The FBI contends that EPIC's bill of 21.4 hours and $6,315.50 for time spent by three attorneys drafting, reviewing, discussing, and filing the Complaint "is excessive for

---

[11] In *Weisburg*, the various factors to be considered on remand in calculating the lodestar fee included whether any time billed was nonproductive, expended on issues on which the plaintiff did not ultimately prevail, or excessive.

[12] In support of its Motion, EPIC attaches a Bill of Litigation Fees and Costs (ECF No. 15-2, Ex. 1); a Case Billing Record for all of the work performed on the case (ECF No. 15-3, Ex. 2); separate Case Billing Records for each attorney who worked on the case (ECF Nos. 15-4–15-8, Exs. 3–7); a copy of the *Laffey* Matrix for 2003–2012 (ECF No. 15-9, Ex. 8); and Affidavits of each attorney who worked on the case in support of the work performed (ECF Nos. 10-14).

what should have been a simple complaint describing the FOIA requests and its correspondence with FBI regarding the requests and asserting boilerplate claims regarding failure to respond."  (Opp'n 18).  It asks that the Court permit EPIC to recover only six to eight hours for drafting the Complaint, although it offers no explanation of how it arrived at these particular numbers.  (*Id*. at 19).  The Court notes that the time EPIC spent preparing the Complaint was incurred only because of the FBI's admitted failure to comply with the law.  *See, e.g. Elec. Privacy Info. Ctr. v. U.S Dep't of Homeland Security*, 999 F. Supp. 2d 61, 74 (D.D.C. 2013) ("If FOIA's statutory requirements as applied to this case were so 'simple' and 'straightforward,' DHS might have been better served by complying with them—rather than by ignoring statutory deadlines and meeting their legal obligations only upon being served with a complaint in federal court."); *L.A. Gay & Lesbian Cmty. Servs. Ctr. v. IRS*, 559 F. Supp. 2d 1055, 1061 (C.D. Cal. 2008) ("Reminding the Court of the waste of resources engendered by Defendant's failure to comply with its obligations hardly persuades the Court to reduce the fee award.")

The FBI argues that the 25 paragraphs in EPIC's Complaint regarding the NGI program and facial recognition technology in general "are completely irrelevant and unnecessary."  (*Id*. at 19).  The paragraphs that the FBI complains of (¶¶ 7–32) comprise a small part of the Complaint's 73 total paragraphs.  Further, the facts alleged in those paragraphs regarding the NGI program and facial recognition technology inform the reasons for EPIC's FOIA requests and are particularly relevant to the Court's evaluation of EPIC's fees request.

For the reasons set forth above, the Court rejects the FBI's arguments to reduce the time EPIC's counsel spent drafting, reviewing, discussing, and filing the Complaint.

> **b.  Recovery of Fees for Reviewing Documents and Other Work Performed After the June 28, 2013 Order**

The FBI argues that EPIC is not entitled to reimbursement for any work performed after entry of the Court's June 28, 2013 Order, which ordered production, because EPIC did not subsequently obtain any additional relief from the Court after EPIC reviewed the released documents.

The FBI claims that because FOIA provides district courts with jurisdiction only to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld" (5 U.S.C. § 552(a)(4)(B)), a party may only obtain fees insofar as such fees relate to an agency's withholding of documents.  The FBI, however, has cited to no authority that limits FOIA fee recovery solely to fees related to withholding.  Rather, FOIA simply provides that a court may assess "reasonable attorney fees and other litigation costs reasonably incurred *in any case* under this section in which the complainant has substantially prevailed."  5 U.S.C. 552(a)(4)(E)(i) (emphasis added).  The proper statutory inquiry, therefore, is whether the fees requested were reasonably incurred in litigating the case.

The Court finds it reasonable that EPIC's counsel reviewed the 2,462 pages of documents the FBI produced during this case to ensure the agency's compliance with FOIA and the Court's June 28, 2013 Order.  While EPIC did not subsequently challenge any of the FBI's redactions or seek further Court-ordered relief after the FBI finally produced the requested documents, it needed to review the documents before making those

decisions.  Such review took place during this litigation and before the parties stipulated

that the underlying matter was settled.  For these reasons, the Court finds that the time

EPIC spent reviewing the FBI's document production, including the time spent resolving a

non-sequential document issue,[13] was reasonably incurred in litigating this case.  *See Elec.*

*Priv. Info. Ctr. v. U.S. Dep't of Homeland Security*, 811 F. Supp. 2d 216, 240 (D.D.C.

2011) ("It would seem critical to the prosecution of a FOIA lawsuit for a plaintiff to

review an agency's disclosure for sufficiency and proper withholding during the course of

its FOIA litigation.").

### c.  The Amount of Hours Claimed for Work Performed After Obtaining the June 28, 2013 Order

The FBI takes issue with some of the time EPIC billed for particular work

performed after the Court's June 28, 2013 Order, claiming it was unnecessary and

unproductive.  (Opp'n 22–24).  First, the FBI disputes EPIC's December 3, 2013 billing

entries (4.5 hours of work for a total of $1,336.50).  (Opp'n 22).  In response, EPIC points

out that the parties were then under a Court-imposed motions briefing schedule; the FBI's

deadline had passed and the FBI had not communicated with EPIC or the Court regarding

the lapsed deadline.  (Reply 12).  EPIC's billing records reflect work related to the lapsed

deadline and a teleconference between counsel for both parties on December 3, 2013,

regarding the FBI's missed deadline and next steps.  The next day—December 4, 2013—

the parties filed their Joint Status Report indicating they had settled the merits and only

the fee issue remained.  There is no indication in the record that the parties had settled the

---

[13] In order to resolve a non-sequential document issue (explained at Opp'n 5–6), the FBI voluntarily produced a draft document that is fairly construed as outside of the FBI's obligations under EPIC's FOIA requests.  However, the FBI produced the document during this litigation to assure EPIC that production was complete, and EPIC may therefore fairly and reasonably recover fees related to it.

merits until after EPIC's efforts on Dec. 3, 2013,[14] and no indication that the FBI explained the lapsed deadline to EPIC until EPIC reached out to the agency that day. "The district court must disallow claims for 'excessive, redundant, or otherwise unnecessary' charges." *Okla. Aerotronics, Inc. v. United States*, 943 F.2d 1344, 1347 (D.C. Cir. 1991) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)).   Determination of how much to trim from a claim for fees is committed to the court's discretion.  *Id.* (citing *Pierce v. Underwood*, 487 U.S. 552, 571 (1988)).   The Court finds that the work EPIC performed on December 3, 2013 was not "excessive, redundant, or otherwise unnecessary" and that it was reasonable under the circumstances, and is therefore recoverable.

Second, the FBI takes issue with EPIC's billing entries for October 7, 2013 (3.5 hours of work for a total of $1,117.50) regarding the FBI's Motion for a Stay (ECF No. 12).  EPIC undertook this work after the FBI inquired whether EPIC would consent to a request to stay the briefing schedule given a lapse in appropriations funding.  (Opp'n 22).  EPIC contends that the funding lapse constituted a novel litigation obstacle that it needed to resolve.  EPIC claims that it had apparently "received notification from the Third Circuit that it expected all government agencies to meet their litigation deadlines" despite the lapse, so EPIC researched and discussed whether this Circuit had the same expectations.  (Reply 12).  The Court finds EPIC's explanation reasonable under the circumstances and declines to strike the October 7, 2013 billing entries, with the exception of time spent on a triple-billed conference call to opposing counsel as explained below.

---

[14] EPIC's Billing Record shows the last entries prior to December 3, 2013 were on November 18, 2013, when both parties' counsel discussed "*proposed* settlement."  (Mot. Ex. 2 (emphasis added)).

The FBI challenges EPIC's instances of "triple-billing" telephone conference calls—that is, billing three attorneys' time for one call.  (Opp'n 23–24).  EPIC contends that this practice was an efficient allocation of its time and resources that allowed its counsel to stay informed about the suit's progress and allocate work efficiently.  "[T]he Court will pay particularly close attention when many lawyers bill for a single task." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Security*, 982 F. Supp. 2d 56, 60 (D.D.C. 2013); *cf. Copeland*, 641 F.2d at 891 ("[W]here three attorneys are present at a hearing when one would suffice, compensation should be denied for the excess time.") While the time EPIC billed for the triple-billed calls is minimal compared to the total time expended in this matter, the Court agrees with the FBI that it was unnecessary for EPIC to bill for three attorneys on a single telephone call.  EPIC's billing records present seven instances of triple-billed telephone conference calls.  The Court reduces the amount EPIC may recover for each triple-billed telephone conference call to the time of one junior attorney at the lowest *Laffey* attorney rate of $245, a total reduction of $851.00, as follows:

**Multi-Attorney Teleconferences**
Dec. 13, 2013 Billing Record (ECF No. 15-3)

| Date | Recoverable Hours | Recoverable Rate | Requested Amount | Recoverable Amount |
|------|-------------------|------------------|------------------|--------------------|
| Sept. 3, 2013 | 0.2 | $245.00 | $199.00 | $49.00 |
| Sept. 23, 2013 | 0.2 | $245.00 | $199.00 | $49.00 |
| Oct. 7, 2013 | 0.3 | $245.00 | $298.50 | $73.50 |
| Nov. 5, 2013 | 0.1 | $245.00 | $99.50 | $24.50 |
| Nov. 18, 2013 | 0.2 | $245.00 | $199.00 | $49.00 |
| Dec. 3, 2013 | 0.2 | $245.00 | $199.00 | $49.00 |
| Dec. 11, 2013 | 0.2 | $245.00 | $199.00 | $49.00 |

|  |  |
|---|---|
| **Total amount requested**<br>**for multi-attorney teleconferences:** | $1,194.00 |
| **Total recoverable amount**<br>**for multi-attorney teleconferences:** | $343.00 |
| **Total reduction**<br>**for multi-attorney teleconferences:** | **$851.00** |

### d.  The Hourly Rate for Work Done by Attorneys Julie Horwitz,  Jeramie Scott, and David Brody

The FBI contends that EPIC improperly categorized attorneys Julie Horwitz, Jeramie Scott, and David Brody within the *Laffey* Matrix when determining their reasonable hourly rates.  The FBI argues that because these three attorneys had all been admitted to practice law for less than one year while they worked on this case, they are not entitled to the lowest *Laffey* Matrix hourly attorney rate of $245 because the *Laffey* category for attorneys with "1–3 years" of experience does not include attorneys with less than one year of experience.[15]

Each of the three attorneys graduated from law school in 2012.  (ECF No. 15-10, Horwitz Aff.; ECF No. 15-13, Scott Aff.; ECF No. 15-14, Brody Aff.).  Ms. Horwitz was admitted to the Maryland Bar on December 12, 2012, and Mr. Brody was admitted to the California State Bar on January 27, 2013.  (ECF No. 16-6, Opp'n Ex. 4; ECF No. 16-7, Opp'n Ex. 5).  The FBI alleges that Mr. Scott was admitted to the New York State Bar in

---

[15] Briefly, the Court addresses footnote 24 of the FBI's Opposition, where the FBI questions whether attorneys who are admitted to practice but not in the District of Columbia may recover attorneys' fees from this Court.  The first two cases the FBI cites (*Dickens v. Friendship-Edison P.C.S.*, 724 F. Supp. 2d 113 (D.D.C. 2010) and *Baker v. D.C. Public Schools*, 815 F. Supp. 2d 102 (D.D.C. 2011)) are Individuals with Disabilities Education Improvement Act cases and therefore arise in a different statutory context.  In *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Security*, 982 F. Supp. 2d 56, 64 (D.D.C. 2013), a FOIA case, this Court refused to reduce fees for attorneys who were licensed to practice law but not members of the District of Columbia Bar or the Bar of this Court "because the attorneys' efforts would not then be properly rewarded."  *Id.*

May of 2013 and in support attaches a page from the New York State Unified Court System website (ECF No. 16-5, Opp'n Ex. 3), but this Exhibit simply states Mr. Scott was admitted in 2013 with no indicated month or date of admission.  Mr. Scott's Affidavit (ECF No. 15-13), offered by EPIC, states that he is a "member in good standing of the Bar of New York" but provides no date of admission.  Neither party, therefore, has shown when in 2013 Mr. Scott became licensed to practice law.

The Court first addresses Ms. Horwitz's and Mr. Brody's recoverable rates.  Both were licensed attorneys in their first year of practice while working on this case.  In categorizing legal staff under the *Laffey* Matrix, this Court has drawn a distinction between persons who are licensed to practice law and those who are not.  *See, e.g., Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.,* 811 F. Supp. 2d at 238 (*Laffey's* "paralegal/law clerk" rate applied to plaintiff's attorney for work she performed in that litigation prior to her admittance to the bar); *Blackman v. District of Columbia,* 677 F.Supp.2d 169, 175 (D.D.C. 2010) (finding law firm's normal paralegal rate appropriate for reimbursement for services of non-barred summer associate, just as for any other non-lawyer such as paralegals, law students, or recent graduates who have not yet been licensed to practice law); *see also Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Security*, 982 F. Supp. 2d at 61 ("Even though *Laffey* rates are based on years after graduation, . . . this Court, too, holds that that calculation does not kick in until the graduate is admitted to a bar, and work by graduates who have not yet been admitted to any bar shall be compensated at the paralegal/law clerk rate.").  The *Laffey* Matrix does not provide a category for licensed attorneys below "1–3 years" of experience.  For this reason, the Court in its discretion finds that Ms.

Horwitz and Mr. Brody most fairly qualify as attorneys in the "1–3 years" experience

category of the *Laffey* Matrix, and therefore their reasonable hourly fee is $245.[16]

Mr. Scott presents a different situation. The Court is unable to determine from the

record before it when in 2013 Mr. Scott was admitted to the New York State Bar. EPIC's

December 13, 2013 Case Billing Record (ECF No. 15-3, Mot. Ex. 2) indicates that Mr.

Scott worked on this case between August 27, 2013 and December 11, 2013, but the Court

cannot determine if Mr. Scott was licensed to practice law at any time during that time

period. Because EPIC has not shown that Mr. Scott was a licensed attorney while working

on this case in 2013, the Court adjusts Mr. Scott's rate for 2013 from $245 to $145, the

applicable *Laffey* Matrix law clerk and paralegal rate. *See, e.g. Elec. Priv. Info. Ctr. v.*

*U.S. Dep't of Homeland Security*, 982 F. Supp. 2d at 63–64 (reducing fees to *Laffey*

paralegal/law clerk rate for attorneys who were not a member of any bar while working on

the case). EPIC billed 11.3 hours for Mr. Scott's work in 2013. Subtracting Mr. Scott's

total time billed for the triple-billed calls (1.3 hours) for the reasons explained above

leaves Mr. Scott with 10 recoverable hours for 2013. At EPIC's requested hourly rate of

$245, this amounts to $2,450.00 for Mr. Scott's work in 2013, net of his fees for

participation in triple-billed calls ($318.50) which the Court previously struck in section

III.c. At Mr. Scott's reduced hourly rate of $145 for these 10 hours of work, this amounts

---

[16] The FBI relies on *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Security*, 999 F. Supp. 2d 61, 71–72 (D.D.C. 2013) in support of their proposition that admitted attorneys with less than a full year of experience should not be reimbursed at the "1–3 years" rate. There, the Court in its discretion split the difference between the lowest attorney hourly rate of $245 and the paralegal and law clerk hourly rate of $145 and awarded fees at $195 for a licensed attorney within her first year of practice. *Id.* The *Laffey* case itself, however, clarifies the issue. *Laffey* indicates that the matrix's years of experience categories correspond to attorneys *within* the specified years of practice (e.g., the "1–3 years" category encompasses attorneys in their first through third year of practice). *Laffey*, 572 F. Supp. 354, 371 (D.D.C. 1983). Further, application of fee matrices merely "provide a useful starting point" for the Court's determination of reasonable hourly rates when awarding attorneys' fees, *Covington*, 57 F.3d at 1105–11, and that determination is within the Court's discretion, *Copeland*, 641 F.2d at 901 (*en banc*).

to $1,450.00 for his work in 2013 net of separately-struck fees for the triple-billed calls, for an additional reduction of $1,000.00.

### e.  EPIC's Request for Fees on Fees

The FBI argues that because most, if not all, of EPIC's fees requests are "unwarranted or unsupported," the amount of "fees on fees," or fees for work performed in defending its fees request, should be reduced accordingly.  (Opp'n 25).  *See Comm'r, INS v. Jean*, 496 U.S. 154, 163 n.10 (1990) (recovery for fees on fees litigation should be reduced to the extent work was performed defending a particular underlying fee that was denied).  The FBI does not suggest a reduction amount or percentage.

The Court rejects the FBI's "fees on fees" argument.  The Court has reduced EPIC's total fee award by $1,851.00, a reduction of only approximately 8.5%.  The Court's reductions are minor and EPIC did not spend significant time defending the fees the Court reduced.  EPIC devoted only a single paragraph of its Reply brief to defending its triple-billed calls and did not spend any time defending Mr. Scott's bar admission date, as the parties did not address that issue.  The Court finds the majority of EPIC's fee requests warranted and supported and that EPIC did not spend significant time defending the reduced fees, and therefore it declines any further reduction for "fees on fees."

### f.  Fees for Preparation of the Reply Brief

In its Reply brief, EPIC requests an additional $6,272.50 in attorneys' fees for 22.1 hours of work incurred in preparing the Reply.  (Reply 1; *Id*. Ex. 1 (ECF No. 17-1)).  Because the FBI has had no opportunity to contest these fees, the Court scrutinizes them particularly carefully.

The FBI's 27-page Opposition is significantly longer that EPIC's 16-page Motion, raised numerous objections, and introduced a considerable amount of case law beyond that which EPIC set forth in its Motion.  It is reasonable that EPIC expended 22.1 hours of work to prepare its 14-page Reply and fully address the FBI's objections.  Consistent with those for its Motion, EPIC's billing records for the Reply indicate a reasonable division of responsibilities between senior and junior attorneys and that the majority of the work was done by the junior attorneys.  In addition, EPIC used the lower 2012–2013 *Laffey* rates for the Reply even though the work occurred in January of 2014, when EPIC could have billed at the higher 2013–2014 *Laffey* rates.  Further, as noted above, the Court in its discretion declines to reduce any fees on fees and therefore makes no adjustment to the Reply fees on that basis.  For all these reasons, the Court finds that the $6,272.50 in fees EPIC seeks for the 22.1 hours of work spent preparing its Reply brief are reasonable and recoverable.[17]

## IV.    CONCLUSION

EPIC seeks to recover the $350 cost for filing its Complaint.  The FBI accepts this amount[18] and FOIA permits recovery of costs against the government.[19]  The Court, therefore, awards EPIC $350 in costs.

EPIC seeks $15,501.50 in fees incurred in litigating this matter and an additional $6,272.50 in fees incurred in preparing its Reply, for a total of $21,774.00.  For the

---

[17] The Court notes that the work Mr. Scott performed preparing EPIC's Reply brief occurred in 2014, after he was licensed sometime in 2013 to practice law.  EPIC therefore may recover for Mr. Scott's work on the Reply at the $245 per hour attorney rate that EPIC seeks.

[18] (Opp'n 25).

[19] FOIA permits assessment "against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed."  5 U.S.C. 552(a)(4)(E)(i).

foregoing reasons, the Court grants in part EPIC's Motion for Attorney Fees and Costs (ECF No. 15). The Court reduces the total fees EPIC seeks by $851.00 for triple-billed telephone calls and an additional $1,000.00 for Mr. Scott's reduced 2013 hourly rate of $145, for a total reduction of $1,851.00. The Court, therefore, awards EPIC $19,923.00 in attorneys' fees.

Lastly, pursuant to the parties' representation in their Joint Status Report (ECF No. 14) that there are no other outstanding legal issues in this matter, the Court dismisses this matter with prejudice. A separate Judgment in accordance with this Memorandum Opinion will issue.

Date:  November 5, 2014

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge